This was an action of ejectment. On the trial it appeared that the grant under which Smith and others claimed was elder than that under which the lessee of Craig claimed. Craig introduced his entry with a view to overreach the grant of his adversary. After this entry was read, and the parol testimony to support it heard, the Court were asked to instruct the jury that Tatom's entry, which Craig calls to adjoin, was vague and uncertain; Craig's must be so likewise, and therefore Smith entitled to recover; but the Court charged that Tatom's entry was special and well surveyed, and therefore Craig entitled to recover. To this charge exceptions were taken; and now the question is, whether the judge mistook the law upon this point. Tatom's entry, the one objected to, is to this effect, to wit, "No. 251, February 6, 1784, Absalom Tatom enters 5000 acres of land, lying on the south side of Big Harpeth River, on the fork called Daniel's fork, it being the second creek to the westward from where the commissioners began the line, near the glades of Harpeth, and about eight or ten miles west from the said beginning, which said line is the southern boundary of Davidson county, beginning west of the ten-mile tree, and extending north and south and east, for quantity." On the 16th of February, 1786, a grant issued to Tatom upon this entry; it begins 30 poles westwardly of the ten-mile tree running north, west, south, and east 960 poles. It appeared in proof that Big Harpeth and the commissioners' line were both notorious; that Daniel's fork is the same now called West Harpeth, and was the second creek to the westward from where the commissioners began to run, which was also a place of notoriety, as well as the ten-mile tree. Daniel's creek, now called West Harpeth, is included in the survey, so is the ten-mile tree, and so is the *Page 288 
commissioners' line, it being about 350 poles south of the northern boundary of the survey. It stands admitted upon the record, that, if Tatom's entry is a special entry and well surveyed, Craig's, which depends upon it, should be so likewise.
To Tatom's entry it is objected, that the place of beginning is not given, and therefore it is not good, — the call being to begin west of the ten-mile tree, without saying how far west. To this it is answered, You are to take the whole calls of the entry together, and if, from the whole, the surveyor and others could know to a reasonable certainty the tract intended, that is sufficient. The land is to lie on Daniel's fork; if you begin many miles west of this tree, as is supposed, your survey would not touch the creek. This second call, then, compels you to begin not far west of the tree; but it is said this creek was not notorious by that name. To this it is answered. That makes no difference, because the creek is so described by reference to other objects that were notorious, that no man could well mistake it; it is the second creek westward, c. Take these two objects, and their distance from each other, and they force the beginning not far west of the tree, otherwise the survey will not include them, which it must be evident was intended should be done. To make an entry good under our laws, it is not necessary that it should fix with precision either the beginning or boundaries of the land; a general description of the tract the locator intended to appropriate is all that is conceived to be necessary. And with respect to this entry, it may be truly said, if it be not good from the facts stated in the record, it will be hard to find one that was made at an early day that is good. But it is said it is not well surveyed, even if the beginning point is correctly fixed; because the commissioners' line, which runs east and west, ought to have been equidistant from the north and south boundary, which it is not. This objection is not well founded; our laws do not expressly require that it should be so, and the uniform construction of the laws has been, that you need not do so. It is too late to change the course of thinking under these laws; they have been practised under ever since the year 1783; and, even if it were now pretty certain that first impressions respecting their meaning were incorrect, it is too late to put the matter right. Hundreds of titles have been acquired without any person suspecting that modern notions were to be applied to them, and are they all to be disturbed? What benefit will result from this course? We will prove that *Page 289 
with extreme labor, after the lapse of thirty years, we have been enabled to construe our laws differently from all who practised under them, and thereby defeat or unsettle most of our titles to land. This may be convenient enough for those who were not early adventurers, or yet have warrants to satisfy, but it will not promote the true interest of society. In deciding questions of this kind, we must look back to the times when these entries and surveys were making; the country was then a wilderness, difficult and dangerous to explore, and can it be possible that any reasonable legislature, prescribing rules for the people of such a country, intended that all this strictness which is insisted on of late years should be observed? It is thought not. A very strong proof that this was not the intention of the legislature is, that no person, in North Carolina or Tennessee, ever thought of such construction until the country had ceased to be a wilderness; until every place and watercourse has an appropriate name, and until any person may, without being in personal danger, take as much time as he pleases to examine and describe the land he wishes to appropriate. If people calculate that they can at the present day go, and by critically examining other men's titles find out that every thing does not correspond as precisely as it might have been made to do, and come here to get their objections to other men's titles sanctioned, it ought to be answer enough to their applications to tell them, You ought to be content with the law as it has been administered for the last thirty years; your professions of good to old entries, and of a desire to have the law so well defined as to support them, will be the very means of rendering ineffectual almost the whole of them; and therefore we cannot comply with your wishes. If mistakes of this kind do exist, they have been quite common, almost universal; and this is one of the cases in which this maxim should be applied, "communis error facit jus."
The judgment of the Circuit Court must be affirmed.