NicholsoN, C. J.,
delivered the opinion of the Court.
The bill in this case is filed to settle the administration of the estate of Charles L. Yancy; to have an account of the advancements, and partition or sale of the real estate.
The proof in the cause shows that in December, 1861, the intestate put into the possession of his daughter, Sarah A. Duke, a negro woman, Betsy, and charged the same on his book as an advancement, at $500. It further appears by the proof, that in January, 1862, he put into the possession of his daughter, Martha Patton, the negroes Mariah and her children, and charged them on his book as an advancement, at $1,500. The two daughters took possession of the negroes and held them until they were emancipated, but it does not appear that they knew of their being charged to them as advancements.
The Chancellor held, that the negroes were to be charged as advancements in the account. From this *357 bolding the two daughters and tbeir husbands have appealed to this Court.
The first question arising upon these facts is, were these gifts to the daughters such advancements as constituted valid charges against them, in the settlement of the estate? An advancement is an irrevocable gift by a parent, who afterwards dies intestate, of the whole or a part of what it is supposed the child will be entitled to on the death of the party making the advancement: 2 Williams on Exh’s, 1350.
By see. 1766 of the Code, “all gifts of slaves shall be in writing, or be utterly void and of no effect whatever.”.
The writing required to make s the gift of a slave valid, must be understood as meaning such written instrument as would be proper to convey the title. A mere memorandum made by the donor in his own book, without the knowledge or concurrence of the donee, can not be regarded as such compliance with the statute as the law contemplated. If a gift at all, therefore, it was a parol gift, and communicated no title: Neely v. Wood, 10 Yerg., 486; Crippen v. Bearden, 5 Hum., 129.
The title to the slaves continued in Charles L. Yancy, and could not be charged to his daughters as advancements, unless they held them long enough to perfect their titles under the statute’ of limitations.
This, brings us to the question, whether the 4th sec. of the schedule to the constitutional amendments of 1865, and the act of 1865, c. 10, suspending the statutes of limitation from the 6th of May, 1861, to *358 the 1st of January, 1867, were operative as valid laws?' This exact question was determined by this Court in the case of Girdner v. Stephens, 1 Heis., 280. In that case it was held, that “a right to a defense complete-under the statute of limitations can not be taken away by a statute, ordinance of a constitutional convention, or amendment of the Constitution.” If this decision is adhered to and is applicable to the facts, it is-conclusive of this branch of the case. .
The correctness of the decision in Girdner v. Stephens has been controverted by counsel with marked ability, and we have listened to the argument with much interest, being entirely willing, and even anxious,, to correct any error into which we may be shown to-have fallen.
There can be no debate at this day as to the proposition that a convention of a people of a State, in making or amending their fundamental law, is restricted in its powers only by the limitations of the Federal Constitution.' We yield a ready assent, also, to the proposition, that the judicial department will not declare an act of the legislative department unconstitutional, unless its violation either of the Federal or State Constitution is clear and free from doubt. And we hold it an equally sound doctrine, that when the judicial department is called upon to determine whether a convention of the State has introduced into its Constitution a clause in violation of the Constitution of the United States, the paramount duty of sustaining the Federal Constitution should require it to be clearly made out, that the State Constitution is in harmony *359 with tbe Federal Constitution. Bound, as we are, by the most solemn obligations to support and protect both of these constitutions, we have re-examined the questions so thoroughly discussed before us, with no other feeling than anxious solicitude to discharge our whole duty.
The 4th section of the schedule of 1865 declares, in general terms, that “no statute of limitations shall be held to operate from and after the 6th day of May, 1861, until such time hereafter as the Legislature may prescribe.” This prohibition applies as well to cases in which the bar of the statute had become complete, before the date of the schedule, as to those in which the bar had not then become complete. As to the power to extend the remedy in the latter class of cases, no question is raised. But in those cases in which, by the completion of the bar, no remedy existed at the date of the schedule, did the convention have the power, in harmony with the provisions of the Federal Constitution, to revive the lost remedy or to furnish a new one?
The Federal Constitution declares that “no State shall pass any law impairing the obligation of contracts.” The inhibition is against impairing the obligation of a contract, and not the contract itself. In every case that arises, in which this question is involved, it is essential that it be ascertained what the obligation of the contract is which is alleged to be impaired.
In the case of McCracken v. Haywood, 2 How., 608, the Court say: “In placing the obligation of *360 contracts under the protection of the Constitution, its framers looked to the essentials of the contract more than to the forms and mode of proceeding by which it was to be carried into execution; annulling all State legislation which impaired the obligation, it was left' to the States to prescribe and shape the remedy to enforce it. The obligation of a contract consists in its binding force on the party who makes it. This depends on the. laws in existence when it is made;' these are necessarily referred to in all contracts, and forming a part of them as the measure of' the obligation to perform them by the one party, and the right acquired by the other. There can be no other standard by which to ascertain the extent of either, than that which the terms of the contract indicate according to their settled legal meaning: when it becomes consummated, the law defines the duty and the right, compels one party to perform the thing contracted for, and gives the other a right to enforce the performance by the remedies then in force. If any subsequent law affect to diminish the duty, or to impair the right, it necessarily bears on the obligation of the contract, in favor of one party, to the injury of the other; hence any law, which in its operation amounts to a denial or obstruction of the rights accruing by a contract, though professing to act only on the remedy, is directly obnoxious to the prohibition of the Constitution.”
To determine the question before us, we will make a practical application of the principles and rules, so clearly laid down by the Supreme Court, to the eon- *361 tract, the obligation of which is alleged to be impaired by the legislation of the State.
.The contract between Charles L. Taney and his daughters was, that he gave each of them a slave and delivered the possession. But this contract was by parol, and therefore void, at the election of the donor. The daughters received the slaves in accordance with the parol contract. The contract was made with refei’ence to the law as it then existed, and formed part of it, as the measure of the obligation to perform by the one party, and the right acquired by the other to enforce it. As the law then was, it recognized the right of the donor to reclaim the slaves at any time within three years — and the duty of the donees to restore them, if required within that time. The law provided a remedy for the donor to recover the slaves, and to enforce his right, provided he should resort to that remedy within that time. But the law also provided, that if he did not exercise his right of reclamation within three years, then he forfeited his remedy, and his right to the slaves, and the law vested the right to them in the donees: 2 Meigs Dig., p. 738, s. 1274.
Such was the contract and such its obligation, as measured by the law then in force. But we proceed a step further. The donor failed to reclaim the slaves within the three years. By the terms of the contract, and its obligation as measured by the law in force, the title of the slaves passed out of the donor into the donees. The title became as perfect and absolute in the daughters as if they had been conveyed by bills of sale and for full prices paid.
*362 This was the legitimate consequence of the contract of parol gift, and the law with reference to which the contract was made. So soon as the three years expired, without the assertion of his right of reclamation, the same law at once raises an implied contract, on the part of the donor, that the daughters shall hold the slaves free from any claim on his part. This implied contract necessarily springing out of the original contract, came at once under the protection of the Constitution of the United States. The obligation of that implied contract consisted in its binding force on the donor with whom it was made It became not merely a vested right in the daughters, but a vested right sustained and protected by the obligation imposed by law on their father, not to disturb their right. This is what Judge Shields meant, in the case of Girdner v. Stephens, when he said: “We hold, both on authority and principle, when a cause of action is barred by a statute of limitations, in force at the time the right to sue arose and until the time of limitation expired, that the right to rely upon the statute as a defense is a vested right that can not be disturbed by subsequent legislation.”
It was not held in that case, nor intended to be held, that there were no vested rights which could be impaired by subsequent legislation. The numerous instances in which the Courts have held that vested rights might be divested by subsequent legislation, without violating the Federal Constitution, were examined and considered, in preparing the opinion in that case, and they were not regarded as in conflict with *363 the conclusion announced. Those cases (and they have been cited in this argument) establish the proposition that the prohibition of the Federal Constitution does not prevent the States, either through their conventions or legislatures, from impairing vested rights, provided always, those vested rights are not so dependent on the obligations of contracts as to render them obnoxious to the prohibition of the Federal Constitution. The remarks of Judge Cooley, at p. 369, fully sustain the conclusion in the case of Girdner v. Stephens, and seems to us to place the question in a light that is unanswerable: “ As to the circumstances under which a man may be said to have a vested right to a defense, it is somewhat difficult to lay down a comprehensive rule. He who has satisfied a demand can not have it revived against him, and he who has become released from a demand by the operation of the statute of limitations, is equally protected. In both cases the right is gone; and to restore it would be to create a new contract for the parties — a thing quite beyond the power of legislation.”
Why is the right, acquired by the lapse of the time prescribed for effectuating the bar of the remedy, beyond the power of legislation? Not only because of the obligation of the contract implied by law, but even more palpably because the right so acquired becomes vested as property, and it stands protected by that clause of the Federal Constitution which shields the property of every citizen from disturbance except by due process of law. By the settled law, the lapse of the prescribed time not only bars the remedy, but, in *364 the case of property, it vests a perfect title to the property, and at once comes under the protection guaranteed to tbe rights of property by the Constitution.
But this result follows only from the assumption that the statute of limitations has run on unobstructed and unsuspended during the time prescribed by law. In the case before us, the slaves went into the possession of the donees in December, 1861, and January, 1862. The war was prevailing when the gifts were made. The question raised by these facts was reserved in the case of Girdner v. Stephens, as the Court, in that case held, that it could judicially know that the Courts were not closed in the locality where the transaction occurred. We have determined the question at the present term by holding the ' general proposition, that as the bar operates upon the r’emedy, if, by the existence of civil war, the remedy is suspended, by reason of the fact that the Courts are not open, then and during such time as the Courts are so closed, the statute would be suspended. But that whenever the Court could know judicially that the military lines and occupation of the contending belligerents were fluctuating, and not fixed and permanent, then we could not judicially know whether the Courts were open or not; and hence, that this was a proper question of fact for' proof. The record shows that the intestate, Charles L. Taney, was a resident in Carroll county, and that his two daughters, to whom the slaves were given, resided in Gibson county. We know judicially that these counties were under the military occupation of the Federal armies before the bar of the statute *365 was complete, and that this occupation so continued to the close of the war. The suspension of the civil authorities is the legitimate result of military occupation. Hence, the presumption is, that the civil Courts were not open, and as there is nothing in the record that rebuts this presumption, we.are bound by it; and, therefore, we hold that the bar of the statute was not so completed as to vest the title of the slaves in the daughters. It follows, that they constituted part of the estate of the intestate, and the loss arising from their emancipation will fall on the whole estate.
The decree of the Chancellor is reversed as to the advancements to the daughters, and affirmed as to the $1000 note advanced to N., and the cause remanded. The costs will be paid by the appellees.
Freeman, J., dissented.