BRECKENRIDGE CANNEL COAL COMPANY *et al. v.* J. W.
SCOTT *et al.*

(*Knoxville.*   September Term, 1908.)

1. **LAND LAWS.** System of entries of State lands by the
checkerboard system is valid.

> The checkerboard system of entries of State lands is valid.
> (*Post, pp.* 108, 114, 118.)

Case cited and approved: La Follette Coal, Iron & Railroad Co.
v. East Tennessee Iron & Coal Co., MS., at Knoxville, 1902.

2. **SAME.** Special entry defined.

> A special entry is one that carriers on its face notice, to the
> common understanding of men acquainted in the neighborhood
> thereof, of some call therein, so that other enterers may know
> when without its sphere.   (*Post, pp.* 110, 111.)

Cases cited and approved: Kendrick v. Dallum, Cooke, 220; Banks
v. Sellars, 2 Sneed, 33; Berry v. Wagner, 5 Lea, 564.

3. **SAME.** Same. Entry located by reference to other entries is
special, when.

> Where an entry connects with a certain other entry which had
> as its beginning point the northwest corner of a certain county,
> a point well established by an act of the legislature and one of
> general notoriety, and from that point the calls of the entry
> can, with reasonable industry, be ascertained with certainty
> to a common intent, the entry is special.   (*Post, pp.* 111, 112.)

Case cited and approved:   La Follette Coal & Railroad Co. v.
East Tennessee Iron & Coal Co., 2 Tenn. Chy. App., 668,

4. **SAME.** Presumption, in the absence of evidence, that an
older entry is special to save it from defeat.

> The older entry is to be favored, and it will be presumed, in the
> absence of all evidence, that the locative corner of such entry

Coal Co. v. Scott.

was one well known in the neighborhood at the time the entry was made, so as to make it sufficiently special to save it from defeat.    (*Post, pp.* 111, 112.)

Cases cited and approved:  Smith v. Craig, 2 Tenn., 287; Wallen v. Campbell, 2 Tenn., 320; Talbot v. McGavock, 1 Yerg., 262.

5.  **SAME.  Entry may be shown to be a part of connecting series of entries, and its specialty thus established.**
The specialty of an entry may be shown by proof that it was a part of a series of entries made together, and thus connecting back or communicating with the first entry, which was special because beginning at a well known point.  (*Post, p.* 114.)

6.  **SAME.  Same.  Specialty may appear by inspection of entry books, and tracing back in the series of entries.**
Where the inspection of the entry books shows a series of connected entries made on the same day and located by the same persons, any entry must be traced back, as on the links of a chain, to the original and first entry, the basis of the specialty of all of them.  (*Post, p.* 114.)

7.  **SAME.  Specialty of entry cannot be defeated by subsequent enterer on ground that first enterer may have a survey to include quantity of his entry.**
While the first enterer may, by mandamus, compel the surveyor to run the lines so as to include the acreage, if there is vacant land which may be included in the survey sufficient to make up the shortage, yet, where a survey of an entry containing an insufficient quantity of land is not objected to by the enterer for whose benefit it was made, a subsequent enterer cannot object on the ground that the first enterer may at some time thereafter exercise his right to relief by mandamus.  (*Post, pp.* 114-116.)

8.  **SAME.  Knowledge of entry locator is the knowledge of the enterer and claimants under him.**
The locator of an entry for the enterer is his agent, and the knowledge of the locator is the knowledge of the enterer and those claiming under him.  (*Post, pp.* 116, 117.)

---

Coal Co. v. Scott.

---

9. **SAME.** Entry extending into an adjoining county is valid.

An entry is not invalid because a portion of the land entered or located extends into an adjoining county. (*Post, pp.* 116, 117.)

10. **SAME.** Subsequent enterer cannot object to incorrectness of surveys of prior entries, especially after fifty years.

Where the surveys of entries correct upon their face were made by competent authority, a subsequent enterer, cannot object thereto on the ground that the lines were not correctly run, especially more than fifty years afterwards. (*Post, pp.* 117, 118.)

11. **ADVERSE POSSESSION.** Continued under grant for seven years after acquirement of possessory title before grant perfects title to extent of boundaries of grant, when.

Where a person as a naked trespasser made a clearing and inclosure upon the land of another and held adverse possession of the same for more than seven years, and thus acquired a possessory title, and thereafter entered and obtained a grant from the State for a large quantity of land including within the ·same said clearing and inclosure, and continued his adverse possession in the interlap without any extension thereof for more than seven years under said grant, he thereby acquired a perfected title, not only to the actual inclosure, but also to the extent of his boundaries. (*Post, pp.* 93, 94, 118-120, 123.)

Case cited and approved: Coal Co. v. Parks, 94 Tenn., 263.

12. **STATUTES OF LIMITATIONS.** Suspension of their operation by statute and constitution did not impair vested rights or titles thereunder.

Where a right or title accrued and became vested by adverse possession under the statutes of limitations before the enactment of the statute (Shannon's Code, sec. 4454) and the adoption of the constitutional provision (sched., sec. 4) suspending the operation of the statutes of limitations from the 6th of May, 1861, to the 1st of January, 1867, the right or title was not affected or impaired thereby. (*Post, pp.* 120, 121.)

Code cited and construed: Sec. 4454 (S.); sec 3457 (M. & V.); sec. 2762 a (T. & S.).

Coal Co. v. Scott.

Acts cited and construed:    Acts 1865, ch. 10, sec. 1.

Constitution construed: Sched., sec. 4.

Cases cited and approved: Girdner v. Stevens, 1 Heisk., 280; Yancey v. Yancey, 5 Heisk., 353; Coal Co. v. McDowell, 100 Tenn., 571, 572.

13. SAME. Continued to run during the war where the courts were open for institution of suits, when.

The statutes of limitations would not run after the war began, if it be made to appear that the courts were closed, so that suit could not be brought. (*Post, p.* 121.)

14. JUDICIAL NOTICE. That courts in Scott county in this State were not closed in 1861 and 1862.

The courts will take judicial notice that the courts of Scott county in this State were not closed in 1861 and 1862. (*Post, pp.* 121-123.)

Cases cited and approved: Girdner v. Stephens, 1 Heisk., 280; Harrison v. Henderson, 7 Heisk., 342; Mining & Manufacturing Co. v. Ross, 12 Lea, 1, 13, 14.

Cases cited and distinguished: Yancey v. Yancey, 5 Heisk., 353; Criner v. Cherry, 3 Tenn. Cas., 496, 499.

15. STATUTES OF LIMITATIONS. Registration of deed under void acknowledgment is void as to adverse possession under color of title.

The registration of a deed under a void acknowledgment must be treated as if never made at all, and such deed is ineffective as a color of title under our statute (Acts 1895, ch. 38) requiring registration of deeds as prerequisite to their use for purposes of color of title for adverse possession of lands. (*Post, pp.* 124, 125.)

Acts cited and construed:    Acts 1895, ch. 38.

Case cited and approved:    Byrd v. Phillips, 120 Tenn., 14, 29, 30.

Coal Co. v. Scott.

16. **DEEDS OF CONVEYANCE.** Recited to be made in lieu of a previous unrecorded deed raises presumption that such previous deed was treated as for naught, when.

Where a deed recites that it is made in lieu of a deed made to a named third person on a previous certain date, and that it was never recorded, as shown on the face thereof, it will be presumed, in the absence of proof to the contrary, that the deed so previously made had been surrendered and was treated as for naught between the parties. (*Post, pp.* 123, 125-128.)

17. **ADVERSE POSSESSION.** Not shown to be within the interlap of one tract with another tract, when.

The evidence is stated, reviewed, and held insufficient to show that certain adverse possessions were within the interlap of a certain tract of land with a certain other tract. (*Post, pp.* 128-130.)

18. **EJECTMENT.** Proper joinder of grantors and grantee as complainants in ejectment bill, where grantors reserved uncertain part of timber.

Where the grantors reserved all the timber on the land conveyed, except what was necessary for use by grantee in operating his mines, the grantors and grantee were properly joined as complainants in a bill of ejectment. (*Post, pp.* 130, 131,)

---

FROM SCOTT.

---

Appeal from the Chancery Court of Scott County.— Hugh G. Kyle, Chancellor.

Scott & Chandler and Brown & Cassell, for complainants.

York & Cecil and Lucky, Sanford & Fowler, for defendants.

Coal Co. v. Scott.

MR. JUSTICE NEIL delivered the opinion of the Court.

This is an action of ejectment, brought to recover four tracts of land—the first tract, four hundred and eighty-two acres; the second, eighty acres; the third, one hundred acres; and the fourth, three hundred acres.

The tract of eighty acres is not now in controversy; likewise so much of the four hundred and eighty-two acres and the three hundred acres as lies outside of the Joseph G. Norton grant, under which the defendants claim.

It is conceded by the complainants that as to so much of the land in controversy as lies within the Joseph G. Norton grant, No. 22402, based on entry, No. 2315, the title of the defendants is superior to the grants under which the complainants claim, and that the complainants if they succeed at all, must recover by force of the statute of limitations.

The first question that presents itself is whether certain possessions under which the complainants claim lie within the Norton grant. If they do not lie within the Norton grant, or if no one of them lies within that grant, there would, of course, be no ground for the contention based on the statute of limitations.

The decision of this question may be confined in its application to the possession located at the mouth of Brimstone creek, where that creek enters New river. In the view we take of this case it is unnecessary to

consider any other possession than that one on this branch of the controversy.

The question to be determined at this point is the location of the north line of entry, No. 2315. If that line lies as indicated in the survey made by Boshears, then the possession referred to does not lie within the Norton grant. If the line is located as shown in the survey of Riseden, or in the survey of Jeffers, or as indicated in the evidence of Judge Cecil, then the possession at the mouth of Brimstone does lie partly within entry, No. 2315. After a careful examination of this question we are of the opinion that the north line of entry, No. 2315, runs 1,000 poles due east from the northeast corner of the Dillon entry, No. 1927; and, this being true, entry, No. 2315, would include several acres of the possession at the mouth of Brimstone. We do not deem it necessary to go into the particulars of this matter, further than to say that another entry, made by Joseph G. Norton about the same time that entry, No. 2315, was made, calls for the northeast corner of No. 2315, at a point that would locate it 1,000 poles east of the northeast corner of the Dillon entry, No. 1927. We think this is conclusive. The mistake which was made by Mr. Boshears was running the west line of No. 2315 beyond the length of poles indicated for the purpose of reaching a supposed black gum. It is evident, however, from his deposition, that this black gum was too small to have been the tree called for in that early entry.

Having thus found that the possession at the mouth

of Brimstone creek lies within entry, No. 2315, the controversy between the complainants and the defendants would be settled as to this phase of the case, but for the contention on the part of the defendants that, even though this possession is apparently within the bounds of entry, No. 2315, it is not actually within that entry, because that entry excludes prior and better claims, and that this portion of entry, No. 2315, is covered by the prior entry, No. 783 (grant, No. 21941), in the name of Anthony Dibrell; the grant being issued to Thomas B. Eastland, assignee.

It is insisted that entry, No. 783, is special, and therefore that it outranks entry, No. 2315; that the grant based on No. 783 relating thereto makes a superior title to the grant based on No. 2315. In short, it is insisted by the defendants that this possession, being on land covered by the superior title arising out of No. 783, is not really on the interlap between entry, No. 2315, and the grant for 1,500 acres on which William Buttram, the owner of the possession at the mouth of Brimstone creek, based his right.

If this hypothesis be true, the conclusion necessarily follows that the residue of the Norton grant, based on entry, No. 2315, under which the defendants claim, would not be interfered with by the possession referred to.

It would follow, however, that if defendants be held to have established seven years' adverse possession at the mouth of Brimstone creek, claiming under the 1,-500-acre grant, within the bounds of entry, No. 783, it

must thereby be concluded that the said William Buttram drew to himself the title of so much of the grant based on No. 783 as would be covered by the conflict of that grant with his 1,500-acre grant.

On the other hand, if the contention of the complainants be sound that entry, No. 783, is not special, and if it be held that the possession at the mouth of Brimstone creek continued for seven years from the date of the 1,500-acre grant in July, 1854, within the boundaries of No. 2315, then it would follow that William Buttram acquired so much of entry, No. 2315, as was covered by the conflict between it and his 1,500-acre grant, and this would cover all of the land in controversy between the complainants and the defendants in this case, except the 100-acre tract.

The question, then, to be considered, is whether No. 783 was a special entry.

This entry is one in a series of entries in a checkerboard system, beginning with No. 757. We find in the record a loose paper containing a plat of these entries, beginning at No. 757; next in order is No. 758; next, No. 759; next, No. 777; next, No. 780; next, No. 783.

These entries are thus described in the record taken from the entry books of Campbell county, viz.:

"STATE OF TENNESSEE—No. 757.

"Thomas B. Eastland enters five thousand acres of land in Campbell county, beginning on the northwest corner of Anderson county, and eastern boundary line

of Morgan county, and running thence north eight hundred and ninety-four poles, thence so far east that a line south to the line of Anderson county and with the same to the beginning will include the quantity, excluding all prior claims.   Located 10th March, 1836.

"By Thomas Eastland and J. A. Lane, Locrs."

### "STATE OF TENNESSEE—No. 758.

"Robert M. Eastland enters five thousand acres of land in Campbell county, beginning at the northwest corner of an entry in the name of Thomas B. Eastland for five thousand acres, and running thence north eight hundred and ninety-four poles, thence east for complement, south and west to the beginning, excluding all prior claims and including the quantity.   Located 10th March, 1836.

"By Thomas Eastland and J. A. Lane, Lcrs."

### "STATE OF TENNESSEE—No. 759.

"Samuel V. Carrick enters five thousand acres of land in Campbell county, beginning at the northwest corner of an entry in the name of Robert M. Eastland for five thousand acres, and running thence north eight hundred and ninety-four poles, thence east for complement, south and west to the beginning, excluding all prior claims and including the quantity.   Located 10th March, 1836.

"By Thos. Eastland and J. A. Lane, Lcrs."

121 Tenn—7

"STATE OF TENNESSEE—No. 777.

"John W. Simpson enters five thousand [acres] in Campbell county, beginning at the northwest corner of an entry for five thousand acres in the name of Samuel V. Carrick, and running thence south eight hundred and ninety-four poles, thence west for complement, north and east to the beginning, excluding all prior claims and including the quantity.  Located 10th March, 1836.

"By Thos. Eastland and J. A. Lane, Lcrs."

"STATE OF TENNESSEE—No. 780.

'James Snodgrass enters five thousand acres in Campbell county, beginning at the northwest corner of an entry of five thousand acres in the name of John W. Simpson, and running thence north eight hundred and ninety-four poles, thence west for complement, south and east to the beginning, excluding all prior claims and including the quantity.  Located 10th March, 1836.

"By Thos. Eastland and J. A. Lane, Locrs."

"STATE OF TENNESSEE—No. 783.

"Anthony Dibrell, Sr., enters five thousand acres of land in Campbell county, beginning at the northwest corner of an entry for five thousand acres of land in the name of James Snodgrass, and running thence south eight hundred and ninety-four poles, thence west for complement, north and east to the beginning, excluding all prior claims and including the quantity.  Located 10th March, 1836.

"By Thos. Eastland and J. A. Lane, Lcrs."

Coal Co. v. Scott.

The following are the surveys made upon these entries:

Scale, 400 poles to an inch.

"*State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county for five thousand acres of land entered the 10th day of March, 1836, No. 757, in the name of Thomas B. Eastland, and located by Thomas Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning on the northwest corner of Anderson county in the eastern boundary of Morgan county, on a white oak and Spanish oak, running thence north eight hundred and ninety-four poles to a white oak and dogwood; thence east, crossing Bull creek at 194 poles, crossing a branch at 434 poles, in all eight hundred and ninety-four poles,

to a red oak and pointers; thence south eight hundred and ninety-four poles to a hickory, two black oaks, and a mulberry in a cove; thence west with Anderson county line crossing a branch at 468 poles, in all eight hundred and ninety-four poles, to the beginning, as represented by the annexed plat of survey, excluding all legal prior claims, calculated to be one hundred acres, which would leave 4,900 acres of vacant land in this survey. Surveyed the 30th of March, 1837.

"ALVIS KINCAID,

"Surveyor of Campbell County.

"George Morress and John Havans, S. C. C.

"Surveyor's Book A, p. 70."

Scale of 400 poles to an inch.

Coal Co. v. Scott.

*"State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county for five thousand acres of land, No. 758, entered the 10th day of March, 1837 [1836], in the name of Robert M. Eastland, and located by Thomas Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning on the northwest corner of an entry in the name of Thomas B. Eastland at a white oak and dogwood, running thence north eight hundred and ninety-four poles, crossing New river, to a black gum, a white oak, and two hickories; thence east eight hundred and ninety-four poles to a black oak, a hickory, and maple; thence south eight hundred and ninety-four poles to a red oak and pointers; thence west eight hundred and ninety-four poles, across Bull creek, to the beginning, as represented by the annexed plat of survey, excluding all legal prior claims, calculated to be four hundred acres, which will leave 4,600 acres of vacant land in this survey. Surveyed the 3rd day of April, 1837.

"ALVIS KINCAID,
"Surveyor of Campbell County.

"Geo. W. Morress and John Havans, S. C. C.

"Surveyor's Book A, p. 71."

Scale, 400 poles to an inch.

"*State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county for five thousand acres of land, No. 759, and entered 10th day of March, 1836, in the name of Samuel V. Carrick, and located by Thomas B. Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning on the northwest corner of an entry in the name of Robert M. Eastland for five thousand acres of land, a black gum and white oak, running thence north eight hundred and ninety-four poles, to Young's turnpike road at 374 poles, crossing a branch at 514 poles, crossing Buffalo creek at 858 poles, in all eight hundred and ninety-four poles to three poplars and a sugar tree; thence south eight hundred and ninety-four poles to a black oak,

hickory, and maple; thence west eight hundred and ninety-four poles to the beginning, as represented by the annexed plat of survey, excluding all legal prior claims, calculated to be one thousand acres, which would leave 4,000 acres of vacant land in this survey.    Surveyed the 3d of April, 1837.

"ALVIS KINCAID,

"Surveyor of Campbell County.

"George W. Morress, John Havans, S. C. C.

"Surveyor's Book A, p. 72."

Scale, 400 poles to an inch.

"*State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county, in the name of John W. Simpson, for five thousand acres of land, No. 777, located the 10th day of March, 1836, by Thomas B. Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning at the northwest corner of an entry for five thousand acres of land in the name of Samuel V. Carrick, a maple, dogwood and beech, running thence south eight hundred and ninety-four poles to a black gum and white oak; thence west eight hundred and ninety-four poles, crossing New river, to a white oak; thence north eight hundred and ninety-four poles to a stake in an old field west of New river; thence west, crossing New river at 74 poles, crossing a branch at 284 poles, crossing a wagon road at 574 poles, crossing Paint Rock creek at 844 poles, in all eight hundred and ninety-four poles, to the beginning, as represented by the annexed plat of same, excluding all legal prior claims, calculated to be one thousand acres, which will leave 4,000 acres of vacant land for this survey. Surveyed the 14th day of April, 1837.

"ALVIS KINCAID,

"Surveyor of Campbell County.

"George Morress and John Havans, S. C. C.

"Surveyor's Book A, p. 90."

Coal Co. v. Scott.

Scale, 400 poles to an inch.

"*State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county, in the name of James Snodgrass, for five thousand acres of land, No. 780, located the 10th day of March, 1836, by Thomas B. Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning at the southwest corner of an entry for five thousand acres of land in the name of John W. Simpson, a white oak; running thence north eight hundred and ninety-four poles to a stake in an old field west of New river; thence west, crossing a branch at 36 poles, crossing New river at 380 poles, in all eight hundred and ninety-four poles, to

Coal Co. v. Scott.

two white oaks and a dogwood on the south side of a branch; thence south, crossing a branch at 140 poles, crossing New river near the Campbell county line at 375 poles, crossing Brimstone creek at 760 poles, in all eight hundred and ninety-four poles, to a large poplar, dogwood, and oak; thence east eight hundred and ninety-four poles, crossing Brimstone creek, to the beginning, as represented by the annexed plat of survey, excluding all legal prior claims, calculated to be two thousand acres, which will leave 3,000 acres of vacant land in this survey. Surveyed the 14th day of April, 1837.

"ALVIS KINCAID,

"Surveyor of Campbell County.

"Geo. W. Morress and John Havans, S. C. C.

"Surveyor's Book A, p. 93."

Scale, 400 poles to an inch.

*"State of Tennessee, Campbell County.*

"By virtue of an entry made in the entry taker's office of Campbell county in the name of Anthony Dibrell, Sr., for five thousand acres of land, No. 783, located the 10th day of March, 1836, by Thomas Eastland and Jacob A. Lane, I have surveyed said entry according to said location as follows: Beginning at the northwest corner of an entry for five thousand acres of land in the name of James Snodgrass, two white oaks and a dogwood, running thence south, crossing a branch at 140 poles, crossing New river and the Campbell county line at 375 poles, crossing Brimstone creek at 760 poles, in all eight hundred and ninety-four poles, to a large poplar, a dogwood, and ash; thence west eight hundred and ninety-four poles to a white oak and dogwood; thence east to the beginning, eight hundred and ninety-four poles to the beginning, as represented by the annexed plat of survey, excluding all legal prior claims, calculated to be one thousand acres, which will leave 4,000 acres of vacant land for this survey. Surveyed the 14th day of April, 1837.

"ALVIS KINCAID,
"Surveyor of Campbell County.
"Geo. W. Morress and John Havans, S. C. C.
"Surveyor's Book A, p. 95."

The competing entry, No. 2315, is as follows:

*"State of Tennessee, Morgan County.*

"ENTRY TAKER'S OFFICE—No. 2315.

"Joseph Hatfield enters five thousand acres of land in Morgan county, beginning at the northeast corner of entry No. 1927, in the name of James Dillon, for five thousand acres of land, thence south eight hundred and ninety-four poles to his southeast corner, thence east for complement, north and west to the beginning, including the quantity, excluding prior claims.

"Located 19th April, 1837.

"B. T. STAPLES and J. A. LANE,

"Locators."

It will be perceived by comparison of the entries that No. 2315 was located by one of the same persons who located the series of Campbell county entries based on the Thomas B. Eastland entry, No. 757, and that this entry No. 2315 was located after all of the entries based on No. 757 above set out had been surveyed and their corners and lines actually laid down.

This checkerboard system of entries was held to be good by this court in the case of *La Follette Coal, Iron & R. R. Co.* v. *E. T. Iron & Coal Co.*, opinion by Beard, C. J., at the September term, 1902. See Memorandum Opinion Book for that year.

It appears that in that controversy the case was set down for hearing upon the bill and answer, and the

averments of the answer were taken as true.  The opinion referred to says:

"The answer avers that the Matilda Dillon entry" [the one under which defendant claimed in that case] "is one of a series or chain of entries, made on the 10th of March, 1836, the first step or link in which is an entry by T. B. Eastland, No. 757, 'of five thousand acres of land in Campbell county, calling to begin on the northwest corner of Anderson county, in the eastern boundary of Morgan county, and running thence north 894 poles, thence so far east that a line south to the line of Anderson county and with the same to the beginning will include the quantity, excluding all prior claims'; that in said series or chain there came entries numbered 758, 759, 760, 764, 768, 772, 775, and 793, in the names of different enterers; the last being the entry of Matilda Dillon.

"All these entries are of 5,000 acres of land in Campbell county.

"The answer sets out literal copies of these various entries.  These entries show a regular chain, each connecting with the other.  Entry, No. 758, is here given, and is as follows: 'State of Tennessee—No. 758.  Robert M. Eastland enters five thousand acres of land in Campbell county, beginning at the northwest corner of an entry in the name of Thomas B. Eastland for five thousand acres, and running thence north 894 poles, thence east for complement, south and west to the beginning.'  So in each successive entry there is a call

for beginning at the northwest corner of its predecessor in number, and running thence north 894 poles, and thence east for complement, and thence south and west to the beginning, until entry, No. 768, is reached, when the beginning corner called for is the southeast corner of an entry in the name of Hugh L. Carrick, the same being entry, No. 764, and running thence north 894 poles, thence east for complement, south and west to the beginning, and so in succession until entry, No. 793, in the name of Matilda Dillon is reached. This calls to begin at the southeast corner of entry, No. 775, in the name of James Lowry.

"The question then is, is this call a locative one, and such as to make the entry special? If it is, there is no question but to the extent of the conflict, excluding so much as lies within the Hutton and Smith entry, the defendant has the superior title.

"The cause was set down for hearing on the bill and answer. The result is that all its statements, with the legal and necessary deductions therefrom, must be taken as true.

"In *Kendrick* v. *Dallum,* Cooke, 220, in speaking of the certainty necessary to constitute an entry special, it is said it 'should carry on its face notice, to the common understanding of men acquainted in the neighborhood of it, of some call therein, so that other enterers may know when without its sphere.'

"This definition of a special entry has been approved

Coal Co. v. Scott.

in later cases.  See *Banks* v. *Sellars*, 2 Sneed, 33; *Berry* v. *Wagner*, 5 Lea, 564.

"From these authorities it is evident that, if the beginning corner of the Matilda Dillon entry was sufficiently certain to give other enterers notice to keep outside the boundary of the entry, then the object of the law was obtained.  The court of chancery appeals holds that this entry was special, inasmuch as it connects with the T. B. Eastland entry, No. 757, which had as its beginning point the northwest corner of Anderson county, a point at that time established by an act of the legislature and one of general notoriety, and starting with this point the calls of the Matilda Dillon entry could with reasonable industry and certainty to a common intent have been ascertained.  We agree with that court in that holding.  But we think on another ground the conclusion of that court might be rested.  As before stated, save for the admissions or statements of the answer, we are without any evidence on this point.  Then what is the legal inference from these admissions?  Will the law presume that the southeast corner of entry, No. 775, in the name of James Lowry, was unknown to persons of common understanding in the neigborhood, so as to defeat the prior enterer and let in the younger, or will the presumption be to the contrary?  In *Smith* v. *Lessee of Craig*, 2 Tenn., 287, it is laid down as the true rule that the older entry is to be favored.  And such should be the rule, as in all other cases it is the diligent who are cared for by the law.

"In the absence of all evidence, the presumption should be that the locative corner was one well known in the neighborhood at the time the entry was made, as this presumption saves what would otherwise be defeated.

"The indulgence of this presumption is well sustained by authority. In *Talbot* v. *McGavock,* 1 Yerg., 262, the entry of McGavock called for 640 acres 'adjoining Evan Baker, assignee of Samuel Conor,' and with regard to it Judge Catron said: 'This call to adjoin Evan Baker is *prima facie* good, . . . because we will presume the entry referred to made in compliance with the laws of the country, and that the entry referred to would determine the specialty.' For authority on this point Judge Catron cited *Wallen* v. *Campbell,* 2 Tenn., 320, where it is said: 'Before production in evidence the law presumes all entries to be sufficiently special.'

"It follows, therefore, on this record, and on either ground, that the court of chancery appeals was right in holding that the Matilda Dillon entry was special, and that to the extent of the conflict claimed with the East Tennessee Iron & Coal Company, it had title independent of and superior to the title of complainant."

The opinion of the court of chancery appeals, referred to in the foregoing opinion, is published in 2 Tenn. Ch. App., 668, *et seq.*

It is said, however, in the brief of complainants'

counsel in the present case, that the authority above referred to cannot apply, because certain facts appear in the present case which did not appear in the case in which the opinion referred to was delivered.

The first objection made is that the testimony in this case shows that there was another entry of five thousand acres made in the name of Thomas B. Eastland, reading as follows:

"*State of Tennessee, Campbell County.*

"Thomas B. Eastland enters five thousand acres of land in said county on the waters of Paint Rock creek and Buffalo creek, beginning at a stake and white oak in or near Aaron W. Cotton's line of a thousand-acre tract on the head of Paint Rock, running northwardly to the top of the ridge that divides the waters of Paint Rock and Buffalo creek, waters and various courses for complement. Entered the 13th day of February, 1836.

"[Signed]          THOMAS B. EASTLAND."

It does not appear that that entry was ever surveyed.

The point of the argument is that here are two 5,000-acre entries in the name of Thomas B. Eastland. It is insisted that the second entry in the series which we have set out above, that of Robert M. Eastland, might just as well have begun upon the entry which we have last set out as upon entry No. 757; that a subsequent enterer would not know upon which of these first entries the second would be based; and therefore that such uncertainty was created as pre-

121 Tenn.—8

vented the specialty of subsequent entries following the
Robert M. Eastland entry.

We think this objection overlooks the fundamental
thought underlying the rule that the specialty of an
entry may be shown by proof that it was a part of a
series of entries made together, and thus connecting
back with the first entry, which was undoubtedly spe-
cial, because beginning at a well-known point. Any
one inspecting the entry books would see that all of
these entries were made on the same day and located
by the same persons, and that, beginning with No. 783,
the person examining would be bound to run back, as
on the links of a chain, to the original and first entry,
the basis of all.

The next objection is that the surveys made on this
series of entries and the grants issued thereon do not
conform to the entries, in that they do not include the
amount of land called for in the entries.

It is said in the brief: "In each instance the sur-
veyor located a perfect square, which embraced 5,000
acres of land. In the Thomas B. Eastland tract he
excluded 100 acres, giving him 4,900 acres; in Robert
M. Eastland tract he excluded 400 acres, giving
him 4,600 acres; in the Samuel V. Carrick tract
he excluded 1,000 acres, leaving him 4,000 acres;
and in the Snodgrass tract he excluded 2,000
acres, leaving him 3,000 acres. Consequently, it
being conceded that the lines running south and north
were properly run to a distance of 894 poles, yet the
Simpson and Snodgrass surveys should have extended

a sufficient distance farther west to have included 3,000 acres of vacant land, and even more than this, because there appears to have been 1,000 acres of land previously entered in the Dibrell tract. Where, then, would the east line of entry No. 783 have been located by such series of surveys? There is nothing in this record to indicate where. . . . But, in addition to that, can it be held that a subsequent enterer is bound to run out in order to ascertain whether he is conflicting with older entries, not only a series of entries of this kind, but also the smaller tracts embraced therein which have been previously entered? Such a holding would reduce the entire doctrine of special entries to an absurdity."

The point of the argument is that inasmuch as the several entries contained in the series above set out excluded prior claims, and yet called for a certain acreage, a subsequent enterer would not know how to ascertain the extent of any of the entries included in the chain, because he would not know how to run the lines in order to include the acreage called for, even if it should be held that he would be bound to run out the several prior claims that might be included within the bounds of the said entries. The argument would be of no force where it appeared, as in the present case, that the entries had already been surveyed before the competing enterer sought to make his entry. It would be wholly immaterial to such subsequent enterer that the surveyor had not included in his survey the number of

acres called for in the entry. If the first enterer was content, no subsequent enterer could complain. It is true that the first enterer could, by mandamus, compel the surveyor to so run the lines as to include the acreage, if he could make it appear that there were vacant lands which might be included in the survey, enough to make out the shortage. But, as long as the survey stood unobjected to by the enterer, for whose benefit it had been made, a subsequent enterer could not object on the ground that the first one might at some time thereafter exercise his right to relief by mandamus. It does not appear in the present case that such relief was ever sought, or that there were vacant lands which could have been included, in order to make out the 'shortage. At all events, the entries were construed by the surveyor as requiring him to ascertain the acreage called for in the entries, subject to a deduction by prior claims; and this construction, however erroneous, seems to have been acquiesced in by the enterers. As the matter stood on the entry taker's and surveyor's books, there could be no doubt in the mind of any subsequent enterer.

In addition to these considerations, Lane, who located the Hatfield entry, No. 2315, also located No. 783, and he was the agent of Hatfield, and his knowledge would be the knowledge of Hatfield. Hatfield could not complain, nor those claiming under him, that he had no knowledge of No. 783.

It is insisted that entry, No. 2315, was made in Mor-

Coal Co. v. Scott.

gan county, while entry, No. 783, was made in Campbell county, and the latter could not be special, as the land lies in Morgan county.

It does appear from the survey of No. 783 that it reaches over into Campbell county, but such entries have been held valid. It is insisted that an enterer in Morgan county could not be required to go to the adjoining county to see if there was an entry upon the books of such adjoining county reaching over into the former county. We need not determine how this is, because, as previously stated, Lane, who was one of the locators of the Hatfield entry, No. 2315, had knowledge of the previous entry, No. 783, in Campbell county, and his knowledge would be the knowledge of Hatfield.

It is next insisted that the surveyor who ran out the various entries 757, 758, 759, 777, 780, and 783, made mistakes in his surveys, whereby certain of the lines were longer than the entries called for, and that, running on course and distance, some of them fell short of the points to which they were to run. We do not think this was a point that could be made by a subsequent enterer; certainly not more than fifty years after the surveys were made. The surveys were good upon their face, and the lines would run to the points indicated, whether longer or shorter than called for. The surveys having been made by competent authority, the subsequent enterer would take notice of that survey as made, and would not be justified in attempting a rectification

of the surveys by superimposing a subsequent entry upon prior entries made apparent by such surveys.

We are of the opinion, therefore, that none of the objections made take entry, No. 783, out of the rule applicable to the checkerboard system.

We are therefore of the opinion that No. 783 was a special entry, and the grant based thereon was superior to the grant based on No. 2315.

As above indicated, the conclusion follows that the possession at the mouth of Brimstone creek, being within the interlap of Buttram's 1,500-tract and entry No. 783, carried title to all of that interlap superior to No. 2315, if it shall appear that the possession referred to was held by William Buttram, for seven years under his said grant for one thousand five hundred acres, prior to his sale of that possession to Bailey Buttram.

The question, therefore, to which we shall now address our attention is whether the claim of seven years' adverse possession is made out in the evidence in respect of the said possession at the mouth of Brimstone creek.

It appears that William Butttram had a clearing at that point consisting of three and one-half acres as early as 1842. However, he had no paper title at that time, and did not acquire a paper title until he obtained his grant on the 31st of July, 1854.

We have carefully examined the testimony upon the subject of possession from 1854 onward, consisting of

the evidence of the witnesses John Pemberton, Jake Buttram, Parsada Sexton, C. C. Ellis, and B. Cecil. We do not deem it necessary to reproduce the evidence, in this opinion, or to enter herein upon a discussion and comparison of what the several witnesses said. It is sufficient to say that after a careful examination of this evidence, we are convinced that seven years' adverse possession is made out from 1854 to 1863, inclusive.

It is insisted that inasmuch as William Buttram took and held possession near the mouth of Brimstone creek for a number of years before the issuance of his grant, and there is no specific proof of the extension of the possession after that date, it cannot be referred to the grant, and must therefore be limited to the actual inclosures.

The testimony shows that William Buttram never had any other claim to this land than the 1,500-acre grant and the entry on which it was issued. The case, therefore, falls within the principle of *Bon Air Coal Co.* v. *Parks,* 94 Tenn., 263. The substance of that case upon this point is thus stated in the second syllabus:

"A entered, as a naked trespasser, upon a large tract of land belonging to B, and inclosed and held forty or fifty acres of it for the term of seven years, openly, continuously, and adversely, thereby acquiring a possessory title to that portion of the land. After acquiring this possessory right, A obtained an entry for a larger portion of B's lands, but including the portion previously inclosed. A's possession was continued for

seven years after this entry, but was never extended beyond his original inclosures. *Held*: A's possession extended to the boundaries of his entry, and invested him with a possessory right to all the land therein embraced."

The conclusion reached by the court was based upon the fact that Welsh, to whom the last grant was issued, had no claim of title whatever to the land, but was a naked trespasser; and there being no claim to which this possession could be referred, when he subsequently made an entry and obtained a grant thereon, it was necessarily referred to this entry and grant, and subsequently extended by construction to the outside boundaries of that grant. In that case the possession had been held by Welsh, the trespasser, for more than seven years before he obtained an entry; the possession having been taken in 1874, and his entry made in 1882. Consequently, on the facts, the two cases are substantially the same. It is true the court held, in the case of Bon Air Coal Company, that Welsh had not acquired title to the land, but only a defensive right, and that was because he had not held seven years under his grant, and his entry was not color of title.

The effect of the possession was not destroyed by Acts 1865, p. 27, c. 10, sec. 1 (Shannon's Code, sec. 4454), by which it is provided that the statutes of limitations should not operate from the 6th of May, 1861, to the 1st day of January, 1867. This is true as a matter of law, because the right had accrued before the act was

passed, and could not be impaired thereby, nor by the constitutional provision upon the subject in the constitution of 1870. *Girdner* v. *Stephens,* 1 Heisk., 280, 2 Am. Rep., 700; *Yancey* v. *Yancey,* 5 Heisk., 353, 13 Am. Rep., 5; *Tenn. Coal Co.* v. *McDowell,* 100 Tenn., 571, 572, 47 S. W., 153.

Of course, the statutes of limitations would not run after the war began, if it be made to appear that the courts were closed, so that suit could not be brought. However, upon this subject there is evidence in the record showing affirmatively that the court was open in Scott county as late as November, 1861, because official acts of the sheriff and the clerk of the court are shown in the record. But, aside from this, it is said by the court in *Girdner* v. *Stephens* that the court would judicially know that the courts were not closed in 1861 and 1862. Referring to a question discussed in that case, but not decided, the court said:

"But we do not feel ourselves called upon to decide the question at present, as it does not appear in this record that the courts were closed against the institution of process in the years 1861 and 1862, and this could not in fact have been made to appear, as we judicially know that such was not the fact." 1 Heisk., 289.

This language was cited with approval in the subsequent case of *Harrison* v. *Henderson,* 7 Heisk., at page 342, and again in *Coal Creek Mining & Manufacturing Co.* v. *Ross,* 12 Lea, 1, 14. In the latter case it is said,

on page 13, that the federal army entered Knoxville in September, 1863.   In *Girdner* v. *Stephens,* the case came up from Greene county, and the opinion was delivered by Special Judge Shields, who was a resident of the Eastern division of the State, and was qualified to speak by personal knowledge of the facts of that time.   The case of *Coal Creek, etc., Co.* v. *Ross,* supra, was a Jefferson county case.   We think, from these two cases, we may say that the court judicially knows that the courts of Scott county were not closed in 1861 and 1862.

It appears in *Criner* v. *Cherry,* 3 Tenn. Cas., 496, 499, that under evidence introduced in that case it was made to appear that the circuit court in McNairy county, West Tennessee, held its last term in July, 1861, and the chancery court in February, 1861.

In *Yancey* v. *Yancey,* supra, it appears that the parties resided in Carroll and Gibson counties, and that the statute of limitations, if it began to run at all, began in December, 1861, or January, 1862, and that the court would judicially know that Carroll and Gibson counties were in the military occupation of the federal army before the bar of the statute was complete, and that this occupation so continued until the close of the war.   The court said that the suspension of the civil authorities was the legitimate result of military occupation, therefore that the presumption would be that the civil courts were not open, and, as there was nothing in the record in that case controverting this

Coal Co. v. Scott.

presumption, the court was bound by it, and necessarily must hold that the bar of the statute was not completed, so as to vest the title of the slaves in the persons claiming in that case under the statute of limitations. The court said that whenever it could judicially know that the military lines and occupation of the contending armies were fluctuating, and not fixed and permanent, it could not then judicially know whether the courts were open or not, and that in such a case this would be a proper question of fact for proof.     It is observed, however, that the court has held that it could judicially know, at least with respect to the section of the State in which is found the land in question here, that it was not under military occupation of the federal authorities during the years 1861 and 1862. It would result, therefore, that the presumption would be that the ordinary courts were in full operation.

.  It follows, from what has been said, that the complainants are entitled to recover all of the 300-acre tract in contest between the parties that lies within the entry, No. 783.   It also follows that the complainants are entitled to recover all of the 482-acre tract that lies within entry, No. 783; that is to say, unless it shall hereinafter be held that a one-half interest in that tract is lost by complainants through a defect of proof arising out of a deed purporting to have been made to one A. L. Farrell.   We shall pass this question for the present.  .

The next question in order is whether the complainants are entitled to recover so much of the 482-acre tract as lies south of entry, No. 783. In order to make out their possession to this part of the tract it must appear that the complainants have shown possession for seven years south of the line of entry, No. 783. They insist that they have done this through the Jane Wallace possession, and also through the M. Brown possession. It is insisted that a part of the Jane Wallace possession lies south of entry, No. 783. It appears that all of the M. Brown possession lies south of that entry.

We shall first consider the Jane Wallace possession.

The weight of the proof seems to be that there was about one-fourth of an acre of this possession lying south of the line of entry, No. 783. This fact, however, cannot avail the complainants, because it does not appear that there were seven years' adverse possession under the rule of law applicable to this subject. It appears that there was a possession prior to 1885, but it is not shown whom the persons then in possession were holding under. In 1885 James Meredith took possession for one Hedges, and rented the little lot to Jane Wallace; but Hedges is not connected with the title at all, and this possession cannot be considered. The company was chartered on August 31, 1888. It is only from that time that the possession can be credited. But even if it should be conceded that there was continuous possession from that date on until the 13th of February, 1895, the time would fall short of seven years. We refer

to the date last mentioned, because on that date the act was passed which requires that deeds shall be registered as a prerequisite to their use for purposes of color of title. Laws 1895, p. 54, .c. 38. The deed under which the complainant company holds was registered; but this registration was made on a void acknowledgment, and therefore must be treated as if never made at all. *Byrd* v. *Phillips,* 120 Tenn., 14, 29, 30, 111 S. W., 1109. The deed was properly acknowledged in 1905, and properly registered on February 13, 1907, which was long after the bill was filed. So, in any event, it appears that the seven years' adverse possession is not made out as to the Jane Wallace possession.

The next point to consider is whether there is seven years' adverse possession made out under the Maynard Brown possession on the 482 acres.

This possession is not made out. Even if we could find the evidence that Maynard Brown agreed to hold for the complainants the small strip of land he had inclosed by accident with his own land, that agreement was not made earlier than August, 1899, and this was less than seven years before the filing of the bill in this case: the bill having been filed on the 5th day of September, 1905. In addition, the complainants' deed was not at that time lawfully registered, and for this reason the holding of Brown would be wholly nugatory for the purpose of making complainants' deed effective as color of title. In addition, at most, the agreement of Brown was to hold the particular strip he had in-

closed, and not the whole 482 acres; that is, the proof fails to show that he was appointed agent for the whole 482 acres.

It remains to consider, in respect of this 482 acres, whether the claim made in the brief of the defendants' counsel is good to the effect that, at most, the complainants could claim only a one undivided half of the 482 acres lying within entry, No. 783.

This contention is based on the fact that the deed from Patterson and wife to Melton Mercer and Olive E. Mercer, dated July 21, 1895, recited that it was made in lieu of a deed made to A. L. Farrell December 12, 1884, and that said deed was never recorded. It is said that this conveyance is for one-half interest in the 482 acres, being all that Patterson owned; that it follows from the very recital of the deed that a deed for this one-half interest had before that time been executed to A. L. Farrell, and that this deed remained outstanding in him; that the Mercers and those claiming under them took with notice that A. L. Farrell had a deed for this interest; and that the complainants could not be heard to deny that this interest was outstanding. It is said the presumption is that the deed to Farrell had been delivered; otherwise, there was no necessity of mentioning it. The brief continues:

"It may be claimed that Anna L. Farrell, the wife of M. A. Farrell, in the deed from M. A. Farrell and wife to McClintock and Vansant, is the same A. L. Farrell mentioned as being the vendee of Patterson and

wife.    The burden is upon complainants to show this. In the recital of the deed from Patterson and wife to the Mercers no intimation is made that A. L. Farrell is a woman, or the wife of M. A. Farrell, and there is absolutely no proof to this effect."

The recital in the deed referred to is this:

"This deed is made in lieu of a deed made to A. L. Farrell on the 12th day of December, 1884; said deed having never been recorded, as shown on the face thereof."

The deed referred to as made to A. L. Farrell is not in the record, nor is there any other proof of it, except what appears in the excerpt just given; and, taking it in connection with the fact that this occurs in a deed of the same land to Melton and Olive Mercer, it was intended, of course, that the latter deed should be effective. We think the proper presumption would be, in the absence of any proof to the contrary, that the deed which was previously made to A. L. Farrell had been surrendered and was treated as for naught, between the parties. We do not think that such consequences could be attached to the recital as those above indicated in the brief. In addition, we think it probable that the A. L. Farrell referred to is the Anna L. Farrell who signed the deed made by M. A. Farrell and wife to G. D. McClintock and J. T. Vansant on June 4, 1898. However, it is not necessary to decide this point.

It results, as before stated, that the complainants are entitled to recover all of the 482 acres that lies within entry, No. 783, but no more. They are also entitled to recover all of the 300-acre tract that lies within said entry, No. 783. The rest of the 300-acre tract is not in controversy between the complainants and defendants, as it lies outside of entry, No. 2315, under which defendants claim.

This leaves to be considered the claim which the complainants make to the 100-acre tract described in the bill.

That one hundred acres lies wholly within entry, No. 783, and there is no proof of any possession by Bailey Buttram within the interlap of his 500-acre grant (No. 28349) with the said entry, No. 783 (grant, No. 21941). Therefore complainants must fail as to this tract, because No. 783 is superior to the Bailey Buttram 500-acre grant. It is stated in the brief of complainants' counsel that Judge Cecil testified that the possessions on the 500-acre tract were within entry, No. 783. He does so testify, but he shows in his deposition that he did not understand how the land lay. He said in his deposition that the five hundred acres lay wholly within entry, No. 783, when the surveys show that this was a mistake. We can, therefore, not rely upon this statement of Judge Cecil, because it was evidently a pure mistake.

We are referred, in a supplemental brief filed by counsel for the complainants, to another deposition of

Judge Cecil, wherein he first said that part of the Bailey Buttram possessions along Brimstone creek were inside the Norton grant and part outside; that, while he did not know the exact number of acres that were on the inside, he thought they would amount to something like fifteen or twenty acres; but that he knew positively that a portion of the clearings were on the inside. This was on his original examination. After he had been cross-examined, he was asked the following questions and answers:

"Q. In your examination in chief you were asked in regard to how much of the clearing in the Bailey Buttram 500-acre tract was covered by the Norton grant. You expressed some hesitancy in answering. State what you have to say in regard to this matter now. A. I said that as I understand the boundaries it covers every foot of it, and I was mistaken when I said that I didn't know where the line runs through there. Q. What line did you have in mind when you made the answer that you were uncertain where the exact location of the line was? A. I was thinking of the north and south line, the eastern boundary line of the Thomas B. Eastland grant. Q. Now state whether you are positive all these possessions were covered by the Norton grant. A. Yes, sir; I am pretty positive that they are all covered by it. I know they are. I helped run the north boundary line to the mouth of Brimstone creek, and I helped to run part of the south boundary line, and I know all of it is covered by it."

121 Tenn.—9

It is insisted by counsel for complainants that we must take this merely incidental statement of Judge Cecil, in his effort to correct all misstatements he had made about the Norton grant, as proof that a part of the possessions were on the Eastland grant; that is, entry, No. 783. We do not think the evidence is sufficient to prove the point. If the fact had been so, it would have been easy to prove the matter directly, and not have left it in this hazy, incidental condition, to be drawn merely as a conclusion by indirect inference.

We are of the opinion, therefore, that the complainants are not entitled to recover as to the one hundred acres.

The next and last point is one made by defendants. This is based on the fact that in one of the deeds making the chain of title of the complainants—that is, in the last link of the chain, the deed made by Vansant and McClintock to Breckenridge Cannel Coal Company—the following reservation or exception is made:

"It is agreed and understood by and between the parties to this instrument that the first parties, J. T. Vansant and J. D. McClintock, except from this conveyance all of the timber now growing and standing, or being upon the land described in the foregoing instrument of writing, and said first parties reserve the right, title, and use and control of all such timber to themselves; but the second parties are allowed to have and use

so much as may be necessary for the purpose of operating their mines."

This deed conveys the 482 acres. McClintock and Vansant joined in the bill with the Breckenridge Cannel Coal Company. The point is made that this was an improper joinder, and in the court below a motion was made to dismiss the bill on this ground. The joinder is defended in the brief of complainants' counsel on the ground that McClintock and Vansant were properly joined, because of their interest in the timber, and it was impossible to say what proportion of the timber was owned by them and what proportion was conveyed to the Breckenridge Cannel Coal Company. We think this was a proper joinder. The same reservation is made in the deed made by John W. Hedges and his wife, Mattie, and Kelly Moore and Fanny T., his wife, and A. C. Ferris and Eliza C., his wife, in the deed which they executed to the three hundred acres. Kelly Moore and John W. Hedges and also Andrew C. Ferris, joined in the bill. We think they had the right to join on the same ground stated in respect of the deed made by McClintock and Vansant. J. T. Patterson was also made a complainant, but no point is made upon this, and we are unable to see that he had any interest in the controversy.

A decree will be entered, modifying the decree of the chancellor, so as to conform to this opinion.

The costs of this court will be equally divided between the parties complainant and defendant.